DOMINICK MAZZONE, Plaintiff-Appellant, v. HENRY M. HOLMES, Defendant-Appellee.

First District (2nd Division) No. 1—89—1755

Opinion filed April 24, 1990.

888

Raymond P. Concannon, Ltd., of Chicago (Raymond P. Concannon and Michael P. Concannon, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Ruth E. VanDemark, Peter A. Tomaras, and Craig G. Stifler, of counsel), for appellee.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

Plaintiff-appellant Dominick Mazzone filed a three-count amended complaint on May 8, 1980, against Henry M. Holmes, the Foster McGaw Hospital of Loyola University, and Zimmer Manufacturing Company, seeking damages for injuries resulting from the removal of a surgical pin in 1978. The counts against the hospital and the manufacturer were dismissed with prejudice following an undisclosed settlement.

Holmes moved for summary judgment on April 11, 1989, and his motion was granted. On April 14, 1989, however, the trial judge granted plaintiff's motion for reconsideration and vacated the summary judgment order. Plaintiff then moved for a change of venue, but that motion was denied. The matter went to trial on April 24, 1989, and at the close of plaintiff's case in chief, the trial judge granted Holmes' motion for a directed verdict. Plaintiff now appeals.

The issues raised are (1) whether the trial judge properly denied plaintiff's motion for a change of venue as a matter of right; (2) whether the trial judge properly denied plaintiff's motion for a change of venue on grounds of bias or prejudice; (3) whether the trial judge properly denied plaintiff's request to call Holmes' expert as a hostile witness or as the court's witness; (4) whether the trial judge properly precluded plaintiff from questioning Holmes' expert regarding the number of medical malpractice cases pending against him; (5) whether the trial judge properly precluded plaintiff from questioning Holmes' expert regarding the abandonment of the techniques and materials used by Holmes; (6) whether plaintiff proved a *prima facie* medical malpractice case under the common knowledge doctrine; and (7) whether the trial judge properly granted Holmes' motion to bar plaintiff from calling Holmes' expert as an expert in plaintiff's behalf. We affirm.

Plaintiff's amended complaint alleged that on or about June 16, 1978, Holmes performed an open reduction and internal fixation on

plaintiff's right acromiclavicular joint, utilizing a 7/64-inch Steinman orthopedic pin. The complaint alleged that on July 21, 1978, Holmes attempted to remove the pin, and as a result of his negligence, a portion of the pin broke off and remained embedded in plaintiff's shoulder.

On September 28, 1982, Holmes filed Supreme Court Rule 220 (107 Ill. 2d R. 220) interrogatories, requesting disclosure of plaintiff's experts. On November 17, 1982, plaintiff answered the interrogatories without disclosing any experts.

On February 23, 1984, Holmes filed a motion for summary judgment. No order was entered on that motion. Plaintiff represented to the trial judge at that time that he would either use Holmes as his expert or amend his complaint to add a count under the *res ipsa loquitur* doctrine.

On October 5, 1988, Holmes answered plaintiff's Rule 220 interrogatories, naming Dr. Mitchell Sheinkop as Holmes' expert witness. On December 9, 1988, the case was assigned a trial date of April 10, 1989. On March 7, 1989, Holmes filed supplemental interrogatories, including requests for the identity and opinions of plaintiff's experts. Plaintiff did not answer those interrogatories. On April 3, 1989, plaintiff took Dr. Sheinkop's deposition.

On April 10, the case was assigned to a judge for trial. On the same date, both parties appeared in court and answered ready for trial, and the case was assigned for immediate trial the following day. Later that afternoon, Holmes filed a 12-page motion for summary judgment, attaching Holmes' and Dr. Sheinkop's deposition transcripts.

On April 11, 1989, the trial judge asked plaintiff's counsel to respond to Holmes' motion for summary judgment. Plaintiff's counsel stated that he had just received the motion the day before and requested 28 days in which to respond. The trial judge noted that the case had been pending for nine years and that plaintiff had failed to disclose an expert or add a *res ipsa loquitur* count following Holmes' previous motion for summary judgment. The trial judge asked plaintiff's counsel if there was anything in the record to substantiate plaintiff's allegations or anything in the motion that took plaintiff's counsel by surprise. Plaintiff's counsel stated again that he would like additional time to respond, but that he would stand on his written response to the earlier motion. The trial judge then granted Holmes' motion for summary judgment.

On April 13, 1989, plaintiff filed a motion for reconsideration. A hearing on the motion was held on April 14, 1989, at which plaintiff's

counsel argued that the motion for summary judgment should have been stricken or plaintiff should have been allowed to respond. The trial judge stated he believed plaintiff's counsel had misrepresented the outcome of the 1984 summary judgment motion at the April 11, 1989, hearing and that it would be a waste of time to go to trial because plaintiff did not have an expert witness. Plaintiff's counsel stated again that he needed time to respond to the motion for summary judgment. The trial judge then vacated the order granting summary judgment in favor of Holmes and ordered an immediate trial. The trial date was continued to April 24, 1989, due to Holmes' unavailability.

Immediately after granting plaintiff's motion for reconsideration, the trial judge addressed the parties regarding the rules for *voir dire*, peremptory challenges, impeachment, and evidentiary depositions. The trial judge then heard argument on Holmes' motion to bar plaintiff from introducing expert testimony at the time of trial on the ground that plaintiff had failed to disclose any experts under Rule 220. Plaintiff's counsel requested time to respond, and the trial judge continued the matter until April 17, 1989.

On April 17, 1989, before the trial judge ruled on Holmes' motion to bar plaintiff from introducing expert testimony, plaintiff filed a motion for change of venue. Plaintiff alleged that the trial judge was prejudiced against him, his counsel, and his case. The trial judge denied the motion. Plaintiff then presented a memorandum in which he argued that he had the right to call Dr. Sheinkop, Holmes' expert, as a witness in his own behalf. Holmes responded that plaintiff could not call Dr. Sheinkop as an expert because plaintiff did not disclose any experts as required by Rule 220. The trial judge ruled that plaintiff could call Dr. Sheinkop as a witness but not as an expert witness.

On April 24, 1989, the trial judge granted Holmes' motion *in limine* barring plaintiff from questioning Dr. Sheinkop regarding his personal use of the Steinman pin. Opening statements were then heard, following which plaintiff was called as the first witness.

Plaintiff testified that in 1978, he was a police officer for the Village of North Riverside. On June 15, 1978, he injured his right shoulder while playing softball and was admitted to the Loyola University hospital for treatment. He was first treated by Holmes on June 16, 1978. Holmes told him that he had separated his shoulder and would require surgery. That same day, plaintiff underwent surgery, during which a Steinman pin was implanted in his right shoulder. After the surgery, plaintiff was put in a cast which immobilized his right arm and shoulder. He was discharged from the hospital on June 18, 1978.

Plaintiff wore the cast for three weeks, during which time he visited the hospital as an outpatient six or seven times. On July 7, 1978, the cast was removed and plaintiff's arm was put into a sling. Plaintiff wore the sling for two weeks. Plaintiff denied using or moving his arm while it was in the sling or ever telling Holmes that he had been "active" while his arm was in the sling.

Plaintiff returned to the hospital next on July 21, 1978. On that date, Holmes instructed plaintiff to lie on his back on top of a table and gave him a shot in his right arm. Holmes then attempted to remove the pin in plaintiff's shoulder manually with a tool held at right angles to the pin. According to plaintiff, Holmes stated that he was having some difficulty grasping the pin. Plaintiff felt pressure from the pin and then heard a snap. Holmes stated that he had most of the pin but part of the pin was still in plaintiff's shoulder. Plaintiff saw the portion of the pin that had been removed and described it as having a jagged end. Holmes told plaintiff that the pin sometimes breaks and that, depending on where the remaining portion of the pin was, surgery might be required to remove it.

After the surgery, plaintiff's shoulder was sore, but plaintiff did not take any pain medication. Two weeks after the pin had been removed, plaintiff returned to his job as a police officer. He quit his job in 1985 for reasons not related to his shoulder injury.

On cross-examination, plaintiff stated that he asked Holmes in August 1978 whether he would be able to water ski, lift weights, and play softball. Plaintiff also stated that he did not watch the pin removal procedure because his head was turned in the opposite direction. He admitted that he did not know whether the pressure he felt was caused by the pin breaking or merely by its removal from his shoulder. Plaintiff also admitted that a person wearing an arm sling would be able to move the arm with the sling on.

Following his own testimony, plaintiff sought leave to call Dr. Sheinkop, Holmes' expert, as a court's witness or as a hostile witness under Supreme Court Rule 238, because plaintiff could not vouch for his veracity or credibility. Holmes objected and the objection was sustained.

Dr. Sheinkop nevertheless testified as a witness in plaintiff's behalf. Plaintiff attempted to question Dr. Sheinkop regarding the number of medical malpractice cases pending against him. Following a side bar conference, the trial judge sustained Holmes' objection to that line of questioning.

Dr. Sheinkop testified that he did not believe there was a national standard of care relative to the removal of the pin, but that the stand-

ard in 1978 in the community where he practices was that the pin should be removed intact. Dr. Sheinkop stated, however, that there would not be a deviation from the standard of care if the pin broke during the physician's application of pressure required to remove the pin.

Dr. Sheinkop also testified that if the pin broke, any pain or loss of motion would depend on the location of the portion of the pin remaining in the shoulder. If, for example, the pin was located in the bony clavicle, it would not cause pain, loss of motion, or stiffness in the joint.

Plaintiff's final witness was Holmes, who was called as an adverse witness. On cross-examination by plaintiff, Holmes stated that the standard of care in 1978 did not require complete removal of the pin. He also stated that plaintiff was instructed on July 7, 1978, not to move his arm or shoulder while his arm was in the sling. But according to Holmes, plaintiff told him that he had been loosening his shoulder with the sling on and demonstrated to him how he had been loosening his shoulder.

Regarding the removal procedure on July 21, 1978, Holmes stated that he made an incision in plaintiff's shoulder, told plaintiff to sit up, and then grasped the pin without any difficulty. Once he grasped the pin, it came out easily. Holmes did not hear a cracking sound and did not feel any pressure on the pin. Holmes had plaintiff's shoulder X-rayed and told plaintiff that the portion of the pin remaining in his shoulder would not cause any problems because it was not embedded in the acromioclavicular joint.

Holmes' notes, dated July 21, 1978, were admitted into evidence. Holmes wrote: "pin broke but most of it removed." Holmes nonetheless testified at trial that in his opinion, the pin broke because plaintiff did not follow instructions and moved his arm while it was in the sling.

Following Holmes' testimony, plaintiff rested. Holmes then moved for a directed verdict and, following arguments, the motion was granted.

I

Plaintiff maintains first that the trial judge improperly denied his petition for a change of venue as a matter of right. He argues that the petition should have been granted under section 2—1001(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1001(c)), because, even though Holmes' motion for summary judgment was granted, the trial judge subsequently reversed himself, so that the

trial judge had not actually decided any substantial issue in the case. We disagree.

■■ Section 2—1001(c) of the Code of Civil Procedure provides:

"A petition for change of venue shall not be granted unless it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case, but if any ground for such change of venue occurs thereafter, a petition for change of venue may be presented based upon such ground." (Ill. Rev. Stat. 1987, ch. 110, par. 2—1001(c).)

Courts have construed this provision as allowing a change of venue as a matter of right if the petition is filed before a hearing on the merits and before the trial court has ruled on any substantial issue. (See *Millburn Mutual Insurance Co. v. Glaze* (1980), 86 Ill. App. 3d 1055, 410 N.E.2d 295.) A ruling on a "substantial issue" may be a ruling on an issue of law or evidence. *Heman v. Jefferson* (1985), 136 Ill. App. 3d 745, 751, 483 N.E.2d 537.

■■ In this case, the trial judge's ruling on Holmes' second motion for summary judgment was plainly a ruling on a "substantial issue" for purposes of the venue statute. There is no support for plaintiff's argument that he was nevertheless entitled to a change of venue as a matter of right because the trial judge subsequently vacated his ruling on the summary judgment motion. A similar argument was rejected by the appellate court in *Heman v. Jefferson.* There, the defendants filed a petition for change of venue after the trial court had ruled on the plaintiff's motion for summary judgment, on objections to requests to admit facts, and on motions to strike affidavits. The defendants argued that the petition was nevertheless timely because the order granting summary judgment had been reversed. The court, however, rejected this argument, reasoning that the trial court's rulings afforded the defendants ample opportunity to ascertain the trial judge's attitude toward the litigated issues. In this case, the trial judge's ruling on Holmes' motion for summary judgment likewise afforded plaintiff an opportunity to ascertain the trial judge's attitude toward the issues. Plaintiff, therefore, was not entitled to a change of venue as a matter of right. See also *Millburn Mutual Insurance Co. v. Glaze* (1980), 86 Ill. App. 3d 1055, 410 N.E.2d 295 (mistrial did not vitiate trial court's prior orders for purposes of the venue statute).

## II

■■ Plaintiff maintains next that he was entitled to a change of venue because the trial judge was biased against him, his counsel,

and his case. As evidence of the trial judge's bias, plaintiff quotes at length from the transcript of the April 11, 1989, hearing, during which the trial judge granted Holmes' motion for summary judgment without giving plaintiff additional time to respond, and from the transcript of the April 14, 1989, hearing, during which the trial judge stated that plaintiff's counsel had misrepresented the outcome of the earlier motion for summary judgment, that plaintiff did not have an expert witness, and that going to trial would be a waste of time. Again, we disagree.

At the April 11, 1989, hearing on Holmes' motion for summary judgment, the trial judge first denied plaintiff's request for additional time to respond. The trial judge stated:

"[I]n 1980 the plaintiff filed this suit. We are now in 1989 and this case was sent to me for trial.

Now both of the attorneys have been sitting on their hands doing nothing for some time in this case and all of a sudden the defendant wakes up and serves me with a motion for a summary judgment on the date this case is here for trial.

Now the plaintiff wants time to answer the, case and I am willing to give you time to answer the case if it would help your man in any way, but you have got to tell me where you're going to be helped in any way.

I don't want to deprive your man of his right day in court, but if there is something in the record that substantiates what you're alleging here, you don't even have to file, just read it to me and I'll dismiss this motion for summary judgment rather than waste your time and the court's time on this.

The case is here for trial. I want to proceed with it. Now what have you got that—I mean is is there anything here that's taken you by surprise?"

Plaintiff's counsel repeated his request for additional time to respond to the motion for summary judgment. The request was denied, and plaintiff's counsel stood on his written response to the earlier motion without presenting any further argument. The trial judge then granted the motion for summary judgment on its merits.

These facts do not establish bias or prejudice against plaintiff at the April 11, 1989, hearing. To the contrary, the trial judge showed displeasure at the delays caused by both parties, and at Holmes, in particular, for filing his motion on the day the case was set for trial. The trial judge allowed plaintiff an opportunity to respond to the motion and granted the motion only after plaintiff failed to present further argument for his position.

With respect to the April 14, 1989, hearing, the record shows that the trial judge would not allow plaintiff to call Holmes' expert as his own expert only because plaintiff had not disclosed any expert witnesses as required under Supreme Court Rule 220. The record also shows that the trial judge granted plaintiff's motion for reconsideration, allowed him additional time to respond to the motion to bar expert testimony, allowed him to proceed to trial, allowed him to call Holmes' expert as a witness in his case in chief, and offered to certify the ruling on the Rule 220 issue for interlocutory appeal. Regarding the Rule 220 issue, the trial judge even stated it made no difference to him who won the case, that he did not "hold it against [plaintiff's counsel] for trying to win [his] case," and that he simply felt that the law was against plaintiff on the issue. We cannot conclude on this record that the trial judge expressed any bias or prejudice against plaintiff at the April 14, 1989 hearing.

### III

Plaintiff maintains next that the trial judge erred in refusing to allow him to call Dr. Sheinkop, Holmes' expert, as a hostile witness under Supreme Court Rule 238 or as the court's witness. He argues that he should have been permitted to cross-examine Dr. Sheinkop and should not have been bound by Dr. Sheinkop's testimony, because he could not have vouched for the credibility of Holmes' expert, and because Dr. Sheinkop was impeached when it was elicited that his interrogatory answers were not consistent with his deposition testimony.

Supreme Court Rule 238(b) provides: "If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination." (107 Ill. 2d R. 238(b).) The rule applies only to witnesses who, while on the witness stand, prove to be hostile, uncooperative, or unwilling. (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 926, 419 N.E.2d 578.) Whether a witness is hostile, uncooperative, or unwilling for purposes of the rule is a matter within the sound discretion of the trial court. *Jensen v. Chicago & Western Indiana R.R. Co.*, 94 Ill. App. 3d at 926.

In this case, the trial judge properly denied plaintiff's requests to call Dr. Sheinkop as a hostile witness because Dr. Sheinkop had not yet testified. Plaintiff's renewed request made during his examination of Dr. Sheinkop was also properly denied because Dr. Sheinkop was not hostile, uncooperative, or unwilling. The mere fact that his testimony might have been unfavorable to plaintiff's case

was not in itself sufficient to invoke the hostile witness rule. See *Yamada v. Hilton Hotel Corp.* (1977), 60 Ill. App. 3d 101, 376 N.E.2d 227.

■ Also, contrary to plaintiff's contention, the trial judge did not improperly deny him an opportunity to impeach Dr. Sheinkop. At his deposition, Dr. Sheinkop was asked whether "the pin and a portion of it being situated in the joint as it is [would] be likely to cause either pain, discomfort, [or a] limited range of motion." He answered in the affirmative. Because he answered a compound question, his response was not necessarily inconsistent with his testimony at trial that the pin could cause pain, but might not cause stiffness or a limited range of motion. Thus, Dr. Sheinkop would not have been impeached had cross-examination on this point been allowed.

■ Finally, it is within the trial judge's discretion to call a court's witness and such witnesses are infrequently called in civil proceedings. (See *Crespo v. John Hancock Mutual Life Insurance Co.* (1976), 41 Ill. App. 3d 506, 354 N.E.2d 381.) Considering the limited use of the court's witnesses doctrine and the record in this case, we cannot conclude that the trial judge here abused his discretion.

## IV

Plaintiff maintains next that the trial judge erred in refusing to allow him to examine Dr. Sheinkop regarding the number of medical malpractice cases pending against him. Plaintiff argues that such evidence was relevant to Dr. Sheinkop's interest or bias as Holmes' expert witness.

■ We conclude, however, that the trial judge properly precluded questions regarding the number of medical malpractice cases pending against Dr. Sheinkop. Relevancy considerations preclude the cross-examination of expert witnesses regarding their personal involvement as defendants in malpractice cases. (See *Webb v. Angell* (1987), 155 Ill. App. 3d 848, 508 N.E.2d 508; *Miceikis v. Field* (1976), 37 Ill. App. 3d 763, 347 N.E.2d 320.) The only support for plaintiff's position is the general proposition that parties should have the opportunity to expose the interest or bias of medical experts through cross-examination. (See *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 466 N.E.2d 210.) It is clear, however, that "[s]uch cross-examination should be strictly limited to the number of referrals, their frequency, and the financial benefit derived from them." (See *Sears v. Rutishauser*, 102 Ill. 2d at 411.) Because such questions were allowed in this case, plaintiff's argument is without merit.

## V

Plaintiff maintains next that the trial judge erred in refusing to allow him to question Dr. Sheinkop regarding the abandonment of the technique used by Holmes in 1978. Dr. Sheinkop testified at his deposition that he personally stopped using the Steinman pin in 1975 or 1976 because it was known to break and that the "orthopedic community" in general "knew there was an incidence of failure of any type of metallic device placed across the acromioclavicular joint for stabilization in 1978." Such testimony, plaintiff argues, was relevant on the issue of the standard of care. We disagree.

To prevail on a claim of medical malpractice, a plaintiff must establish the standard of care by which the defendant's conduct is to be measured, that the defendant deviated from this standard of care, and that the defendant's conduct caused injury to the plaintiff. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) On the issue of whether the defendant deviated from the standard of care, an expert's statements as to what he would have done are not relevant because differences in opinion are consistent with conformity to the applicable standard. See *Walski v. Tiesenga*, 72 Ill. 2d at 261; *Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 835, 390 N.E.2d 53.

In this case, Dr. Sheinkop's deposition testimony, that he would not have used a Steinman pin in 1978 and that such pins were known in the orthopedic community to break, was not relevant either on the issue of the appropriate standard of care or the issue of Holmes' deviation from that standard. Dr. Sheinkop testified, in response to questioning by plaintiff's counsel during plaintiff's case in chief, that the standard of care had not changed since 1978, and that the standard required, if possible, the removal of the pin intact. This standard concerns the removal of the pin, not the use of a Steinman pin in treating shoulder separations. Thus, whether Dr. Sheinkop or any other physician would have used a Steinman pin in the first instance had no bearing on the applicable standard of care in this case.

Dr. Sheinkop's deposition testimony, that he would not have used a Steinman pin and that such pins were known to break, was also not relevant on the issue of Holmes' deviation from the standard of care in removing the pin. Dr. Sheinkop testified during plaintiff's case in chief that if the pin breaks during application of pressure by the doctor, the doctor's acts would not fall below the applicable standard of care. Thus, Dr. Sheinkop testified that Holmes did not deviate from the standard of care. Whether Dr. Sheinkop would have used the pin or whether such pins were known to break does not contradict that testimony because more than one procedure may be

consistent with the applicable standard of care.

## VI

Plaintiff maintains next that the trial judge erred in directing a verdict in Holmes' favor because he made out a *prima facie* case of medical malpractice. He argues that, under the "common knowledge" doctrine, he was not required to establish a *prima facie* case through expert testimony because a lay person could readily appreciate that the standard of care required removal of the pin intact and that Holmes fell below that standard in breaking the pin.

 █ To prevail on a claim of medical malpractice, a plaintiff must ordinarily establish through expert testimony the standard of care by which the defendant's conduct is to be measured, that the defendant deviated from this standard of care, and that the defendant's conduct caused injury to the plaintiff. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) There is an exception to this rule in cases where "the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a lay person[.]" (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 242, 489 N.E.2d 867.) This "common knowledge" exception is rarely applied, and cases where it has been applied have been strictly limited to their facts. (See *Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 837, 390 N.E.2d 53.) Post-operative care is generally not within the common knowledge of lay persons (see *Stevenson v. Nauton*, 71 Ill. App. 3d at 837; *Crawford v. Anagnostopoulos* (1979), 69 Ill. App. 3d 954, 387 N.E.2d 1064), and at least one court has held that the placement of orthopedic screws is outside the common comprehension of lay persons (see *McNichols v. Jersild* (1988), 169 Ill. App. 3d 791, 523 N.E.2d 1172).

 Plaintiff's argument in this case fails because the procedures used to place and remove the Steinman pin are not within the common knowledge of lay persons. Regarding removal of the pin, Holmes testified at his deposition and at trial that the pin is removed with a sensitive, 14-inch orthopedic surgical drill with a "pistol grip" and a crank, which requires three pounds of force for each pound of pressure at the drill end. Holmes testified that he grasped the pin without difficulty, applied pressure to the wheel of the drill, and extracted the pin. This procedure is plainly not within the everyday knowledge of lay persons.

Even if the common knowledge exception were applicable, plaintiff's argument would fail because the only evidence of negligence or lack of due care was the broken pin. This "bad result" does not in

and of itself demonstrate lack of skill or negligence (see *Piquette v. Midtown Anesthesia Associates* (1989), 192 Ill. App. 3d 219, 223, 548 N.E.2d 659; *Scardina v. Colletti* (1965), 63 Ill. App. 2d 481, 211 N.E.2d 762) and would not even, standing alone, support a *res ipsa loquitur* cause of action (see *Piquette v. Midtown Anesthesia Associates*, 192 Ill. App. 3d at 223).

## VII

Finally, plaintiff maintains that the trial judge erred in not allowing him to call Dr. Sheinkop as an expert witness. Relying on *Voyles v. Sanford* (1989), 183 Ill. App. 3d 833, 539 N.E.2d 801, he argues that disclosure was not required under Rule 220, because Dr. Sheinkop was Holmes' expert, so that Holmes would not have been "surprised" by Dr. Sheinkop's testimony as plaintiff's expert.

 Initially, we find that plaintiff did not preserve this issue for review. Although the trial court's order dated April 17, 1989, barred plaintiff from calling Dr. Sheinkop as an expert witness, the record shows that plaintiff never requested that he be allowed to call Dr. Sheinkop as an expert. The record contains the following colloquy between plaintiff's counsel and the trial judge:

"THE COURT: Now, you want to call [Dr. Sheinkop] in your case-in-chief as your expert; is that correct or is that incorrect?

[PLAINTIFF'S COUNSEL]: Not as my expert, Judge, I did not retain him as an expert witness. He is a witness who possesses certain knowledge; and, yes, I do wish to call him whatever the Court wishes to call him.

THE COURT: No, no. I want to know what you want to call him.

[PLAINTIFF'S COUNSEL]: I wish to call him as a witness."

In his memorandum in support of his right to call Dr. Sheinkop as a witness, plaintiff never requested that he be allowed to call Dr. Sheinkop as an expert witness. Because plaintiff never raised the issue of calling Dr. Sheinkop as an expert and, indeed, represented to the trial judge that he did not wish to call Dr. Sheinkop as an expert, plaintiff has waived this issue for purposes of review.

Even if the issue had not been waived, plaintiff's argument would fail because he clearly failed to comply with Rule 220's disclosure requirements. Plaintiff's argument, that the rule does not apply to experts already retained by a party to the litigation, is not persuasive. *Voyles v. Sanford* (1989), 183 Ill. App. 3d 833, 539 N.E.2d 801,

relied on by plaintiff, is inapposite because the court there held that Rule 220 did not require disclosure as an expert witness of an occurrence witness who was also "intimately involved in the subject of the litigation" and employed by the defendant at the time of the incident in question. The court reasoned that the witness' identity was discoverable early in the litigation and that because he had been employed by the defendant and involved in the litigation, the only "surprise" to the defendant was that he would be giving an expert opinion.

In this case, by contrast, Dr. Sheinkop's only connection with the litigation was that he was retained by Holmes as an expert. He was not the treating physician (see *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525), nor was he employed by Holmes (see *Smith v. Central Illinois Public Service Co.* (1988), 176 Ill. App. 3d 482, 531 N.E.2d 51). More on point are cases involving late disclosure of experts. In *Fischer v. G & S Builders* (1986), 147 Ill. App. 3d 168, 497 N.E.2d 1022, for example, the court held that prior knowledge of an expert's presence in the controversy was not an adequate substitute for Rule 220's disclosure requirements. The court rejected the argument that the defendant could not have been surprised because it had prior knowledge that the expert witness was involved in the case. In this case, late notice of plaintiff's intention to call Dr. Sheinkop as an expert was likewise not an adequate substitute for Rule 220's notice requirements because Dr. Sheinkop was only retained as an expert and was not in any other respect involved in the litigation.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.